[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 598 
Norbert Y. Thompson and Helen P. Thompson (hereinafter together referred to as "the plaintiffs") sued Garry Gardner ("Gardner"), Garry Gardner d/b/a Gardner Brothers Home Builders, Inc., Dryvit Systems, Inc., Apache Products, and USX Corporation, asserting claims of breach of express warranty, breach of implied warranty, negligence, and fraudulent suppression and misrepresentation. The plaintiffs alleged that the use of an exterior insulation and finishing system ("EIFS"), commonly known as "Dryvit" or "synthetic stucco," on the exterior of their home caused damage to the home. Gardner and Garry Gardner d/b/a Gardner Brothers Home Builders, Inc. (hereinafter together referred to as "the Gardner defendants"), the general contractors that constructed the plaintiffs' home, filed a third-party complaint against Troy Dillard d/b/a Dillard Plastering Company ("Dillard"). Dillard was the subcontractor that installed the EIFS on the plaintiffs' home.
On May 14, 2001, the Gardner defendants filed a motion for a summary judgment on all of the plaintiffs' claims against them. In their summary-judgment motion, the Gardner defendants argued that the statute of limitations had expired as to those claims, and they also asserted arguments on the merits of the claims. On August 8, 2001, the Gardner defendants filed an amended summary-judgment motion in which they reasserted the arguments made in their original motion and also argued that they were entitled to a judgment as a matter of law based on an alleged spoliation of material evidence.
On January 3, 2003, the trial court entered a partial summary judgment in favor of the Gardner defendants. In its January 3, 2003, order, the trial court found that the spoliation of certain evidence necessitated the dismissal of the plaintiffs' claims against the Gardner defendants. The plaintiffs filed a "motion to alter, amend, or vacate" the January 3, 2003, nonfinal partial-summary judgment order;[1] in that motion, the plaintiffs also *Page 599 
sought to strike a portion of an affidavit submitted by the Gardner defendants in support of their amended summary-judgment motion. On April 14, 2003, the trial court entered a notation on the case action summary in which it set aside its January 3, 2003, order, allowed the parties to submit additional arguments or evidentiary materials, and scheduled a hearing for May 30, 2003.
On May 16, 2003, the Gardner defendants renewed their summary-judgment motion, again arguing the issue of spoliation of the evidence. On June 3, 2003, the trial court granted the Gardner defendants' renewed motion for a summary judgment on the plaintiffs' claims. The plaintiffs filed a "motion to vacate," which the trial court denied. On October 10, 2003, on the plaintiffs' motion, the trial court certified its summary judgment in favor of the Gardner defendants as final pursuant to Rule 54(b), Ala. R. Civ. P. The plaintiffs timely appealed.
The record indicates that on May 12, 1992, Gardner, on behalf of the Gardner defendants, entered into a contract with the plaintiffs in which the Gardner defendants agreed to construct a home for the plaintiffs. Gardner hired Dillard, a subcontractor, to install Dryvit-brand EIFS[2] on the exterior of the plaintiffs' home. The plaintiffs and Gardner "closed" on the contract sometime in 1992.
In 1992, and again in 1996, the plaintiffs discovered water leaks in their home. Gardner repaired those leaks. In 1999, on the advice of a friend, the plaintiffs decided to have the EIFS on their home inspected. A company called "Construction and Mechanical Engineering" (hereinafter "CME") inspected the plaintiffs' home and determined that repairs were required. Norbert Thompson testified that he was told that the repairs were necessary because the EIFS had not been installed correctly. CME performed repairs to the plaintiffs' home between February 1999 and April 1999. At approximately the same time, Gardner performed some repairs to the plaintiffs' patio. The plaintiffs *Page 600 
paid approximately $21,421 for all of the repairs performed in the spring of 1999.
On June 1, 1999, the plaintiffs filed their complaint in this action. On November 17, 1999, Rayford Smith, the expert witness for the Gardner defendants, went to the plaintiffs' home to inspect it. Smith testified that he walked around and viewed the plaintiffs' home. Smith testified that when he arrived at the plaintiffs' home, the Gardner defendants' attorney instructed him not to perform a moisture analysis on the plaintiffs' home because "that was not necessary [because] the home ha[d] been repaired."
The record contains a form indicating that the plaintiffs' attorney scheduled an appointment for January 16, 2001, with a company known as "Precision HomeCrafters" to provide an estimate on the cost of removing the EIFS from the plaintiffs' home and recladding the home with a brick exterior. A document listing a series of invoices[3] indicates that between mid-February 2001 and late May 2001, Precision HomeCrafters removed the EIFS from the plaintiffs' home and replaced it with a brick exterior. The total cost of the reclad work performed by Precision HomeCrafters was over $112,000.
George Williams, who was affiliated with Precision HomeCrafters, was present during much of the reclad work. Joel Werhman, a registered professional engineer, inspected the plaintiffs' home approximately 11 times during the time the reclad work was being performed. The plaintiffs listed both Williams and Werhman as witnesses who would testify for them on the issue of the damage the plaintiffs alleged was caused by the EIFS or by the Gardner defendants' improper installation of the EIFS. The plaintiffs indicated that, among other things, Werhman would testify regarding "the inability to identify the true amount of damage until the EIF system is removed," and that Williams would testify "to the necessity for the complete removal of the EIFS and substrate in order to inspect and repair underlying timbers."
It is undisputed that the plaintiffs did not notify the Gardner defendants of the fact that they were having the home reclad with a brick exterior. It is also undisputed that the Gardner defendants first learned of the reclad project in July 2001, after all of the reclad work had been completed. Therefore, Smith, the Gardner defendants' expert, did not inspect the plaintiffs' home during the reclad process.
All of the EIFS materials were removed and either disposed of or destroyed during the reclad process. However, the plaintiffs and their witnesses took numerous photographs of the home during the reclad work. In his affidavits, however, Smith testified that he was unable to determine the cause or extent of the damage to the plaintiffs' home from just the photographs taken by the plaintiffs and their witnesses. In Smith's May 14, 2003, deposition, the plaintiffs' attorney asked Smith to make conclusions based on the photographs taken by the plaintiffs and their witnesses. Smith repeatedly indicated that he was unsure what some of the photographs depicted and that it was difficult for him to determine the subject of the photographs *Page 601 
or whether they indicated that the EIFS had been installed correctly.
On May 16, 2003, two days after Smith's deposition, the Gardner defendants filed their renewed motion for a summary judgment. Smith's May 16, 2003, affidavit, submitted in support of the renewed summary-judgment motion, reads, in part, as follows:
 "When I first saw the [plaintiffs'] home in 1999, the original installation of the EIFS system had been altered by a third party. Therefore, I cannot state with reasonable certainty whether the EIFS system on the [plaintiffs'] home, at the time of original construction, was installed in accordance with the manufacturer specifications and/or industry standards.
 "Without having a significant amount of properly labeled EIFS material which has been removed from the [plaintiffs'] home, it is impossible to determine the causation of any potential damage to the subject home.
 "Because the EIFS was removed and the exterior reclad on the [plaintiffs'] residence without giving me the opportunity to inspect the house during the reclad process, it is impossible to determine the extent of damages due to alleged improper installation. It is also impossible to determine whether any water damages [sic] was caused by improper installation. In conclusion, because the EIFS was removed and the exterior of the house reclad without my having an opportunity to see the home during the reclad process, it is not possible for me to determine the extent of damage, if any, and the true cause and origin of the damage.
 "Further, I have viewed the photographs provided by the [p]laintiffs' counsel at my deposition on May 14, 2003. These photographs fail to provide sufficient information for me to conclude with any degree of certainty the extent, source and cause of damage to the [plaintiffs'] house."
On appeal, the plaintiffs argue that the trial court erred in entering a summary judgment in favor of the Gardner defendants based on the theory of spoliation of the evidence. The most severe sanction available where a party's actions lead to the spoliation of relevant evidence is the dismissal of the party's claims or of the action. Capitol Chevrolet, Inc. v. Smedley,614 So.2d 439 (Ala. 1993). The dismissal of a claim or claims may be an appropriate sanction if a party destroys or disposes of evidence that it knows or should know is evidence that is important to possible or pending litigation. Capitol Chevrolet,Inc. v. Smedley, supra; Cincinnati Ins. Co. v. Synergy Gas,Inc., 585 So.2d 822 (Ala. 1991); Joyner v. B P Pest Control,Inc., 853 So.2d 991 (Ala.Civ.App. 2002).
In Cincinnati Insurance Co. v. Synergy Gas, Inc., supra, an insurance company, Cincinnati, sent its investigator to determine the origin of a fire that destroyed the home of one of its insureds. After its investigation, Cincinnati allowed all of the fire debris, except for a regulator for a fuel tank, to be removed or destroyed. Almost two years later, Cincinnati and its insureds sued the defendant, which had allegedly installed the gas system in the insureds' home. On the defendant's motion, the trial court dismissed the action based upon the spoliation of evidence. Our supreme court affirmed the dismissal with regard to that part of the plaintiffs' claims based on the "alleged malfunction of those components of the gas system that were destroyed by" Cincinnati. Cincinnati Ins. Co., 585 So.2d at 827. However, because the regulator was still available for inspection, the court reversed that part of the *Page 602 
trial court's judgment that dismissed those claims in which the plaintiffs alleged that the regulator was defective and that it alone had caused the fire in the insureds' home. Id.
In reaching its holding, our supreme court quoted with approval the four factors considered and discussed by the trial court in its judgment. Those factors are (1) the importance of the evidence that was destroyed, (2) the culpability of the party who destroyed the evidence, (3) fundamental fairness, and (4) whether there exist alternative sources of the information contained in the destroyed evidence. Cincinnati Ins. Co., 585 So.2d at 824. With regard to those factors, the trial court concluded that almost all of the evidence upon which the plaintiffs based their claim had been destroyed and that, although there was no allegation of malicious intent in the case, the insurance company should have realized the importance of the destroyed evidence to any possible future litigation. Id. With regard to fundamental fairness, the court noted that the defendant's expert had testified that she could not draw any conclusions about the cause of the fire without the destroyed evidence, and it also noted that although the plaintiffs' experts had notified the plaintiffs almost immediately that the defendant's actions allegedly caused the fire, the plaintiffs had waited until only days before the two-year statute of limitations had expired to file their complaint. Id. The court also determined that none of the photographs taken of the fire debris depicted the cause of the fire and that, because there had been no objective testing or measurements conducted, "[t]here exist[ed] no alternative or secondhand sources of information." Id.
The supreme court analyzed the trial court's conclusions as follows:
 "In the present case, the trial court found that the plaintiffs had deliberately disposed of the items that were later the subject of the request for production. Although the trial court noted that there had been no `allegation' of malicious intent on the part of the plaintiffs in destroying the items and that the [insureds'] conduct `might be excusable' because of their lack of knowledge of the importance of preserving evidence for future litigation, the trial court, understandably, could find no justification for Cincinnati's conduct. As we read its order, the trial court found that Cincinnati had willfully allowed the destruction of the items in question, with full knowledge of the importance of those items as evidence in any future litigation. Our conclusion in this regard is based on the trial court's findings that Cincinnati had fire investigators on the scene within three days after the fire; that those investigators had quickly concluded that the gas system allegedly installed by [the defendant] was the cause of the fire; and that Cincinnati, as subrogee under the [insureds'] policy, was aware of the importance of preserving the evidence for future litigation. We also find it to be significant that the plaintiffs' complaint states that Cincinnati paid the [insureds] over $291,000 under the terms of the policy. Because such a large sum of money was involved, it is certainly not difficult to understand why the trial court apparently believed that Cincinnati was aware soon after the fire that future litigation was likely."
Cincinnati Ins. Co., 585 So.2d at 827.
In reaching its holding in Cincinnati Ins. Co., supra, our supreme court also discussed Iverson v. Xpert Tune, Inc.,553 So.2d 82 (Ala. 1989). In Iverson, the plaintiff sued Xpert Tune alleging that Xpert Tune had replaced what it alleged was a defective fuel pump in his automobile, *Page 603 
when, in fact, the plaintiff alleged, the fuel pump was "`in good working order.'" Iverson, 553 So.2d at 84. Iverson discarded the fuel pump replaced by Xpert Tune, but he did not inform Xpert Tune that the fuel pump was not available for its expert to inspect until the day before the expert's scheduled deposition; Xpert Tune had filed a request for production of the pump approximately six months before the scheduled deposition. On Xpert Tune's motion, the trial court dismissed the action after determining that the plaintiff had acted willfully in discarding the fuel pump. Our supreme court affirmed the trial court's judgment, holding that the trial court was in the best position to determine whether the plaintiff had acted willfully in failing to preserve the key evidence in the case. Iverson, supra. In so holding, the court stated:
 "From our review of the record, we find credible evidence from which the trial court found that Iverson was guilty of willful conduct — that Iverson, through his actions, failed to exercise any precaution to safeguard the fuel pump and to protect it from being destroyed or discarded; that he failed to make any effort to determine the whereabouts of the fuel pump following its removal from his vehicle; and that due to Iverson's own actions, crucial evidence in this case no longer existed and its disposal, destruction, or suppression occurred subsequent to Xpert's request to inspect the fuel pump but prior to the scheduled inspection. The trial court's findings of fact were not plainly and palpably wrong."
Iverson, 553 So.2d at 86-87.
In Joyner v. B P Pest Control, Inc., supra, the Joyners alleged that the basement of their home flooded because of work performed on the home by the defendant termite company. The Joyners hired Cox to repair the problem. During the repairs, Cox exposed and perhaps damaged a sewer pipe and, shortly thereafter, more flooding occurred. In the course of further repairs, Cox removed the sewer pipe and later inadvertently disposed of it. The termite company contended that the sewer pipe could have caused the flooding. This court applied the four factors set forth in Cincinnati Ins. Co. and, based on the facts of that case, reversed the trial court's judgment in favor of the defendant based on the spoliation of the evidence. This court concluded that the dismissal of the Joyners' claims on the basis of spoliation was not justified because there was no evidence of any flooding before the termite company performed its work, because there was no evidence that the Joyners willfully disposed of the sewer pipe, because photographs were available, because the termite company could cross-examine Cox, and because the termite company was not prevented from offering other evidence to support its defense. Joyner, 853 So.2d at 997. In so holding, however, this court noted that "[t]here is no question but that dismissal of a party's claim may be an appropriate sanction in a case where the party deliberately disposes of evidence that it knows is important evidence for further litigation." Joyner, 853 So.2d at 996.
We note that Cincinnati Ins. Co., supra, and Iverson, supra, involved a failure to comply with a discovery request made pursuant to Rule 37, Ala. R. Civ. P. In reaching its holdings in those cases, the supreme court discussed the sanctions that were appropriate, under Rule 37(d), in situations in which a party fails to produce evidence as requested during the discovery process. In the case currently before this court, the record does not demonstrate that the Gardner defendants made a discovery request pursuant to Rule 37. However, this court, in Joyner, supra, briefly *Page 604 
discussed Rule 37 in its analysis even though there was no mention of a Rule 37 discovery request in that case. Further, inCapitol Chevrolet, Inc. v. Smedley, supra, our supreme court applied the holdings in Cincinnati Ins. Co. and Iverson in a case that did not involve the application of Rule 37, Ala. R. Civ. P.
In Capitol Chevrolet, Inc. v. Smedley, supra, an insurance carrier investigated the cause of a fire that completely destroyed its insured's van. The investigator cited an "unknown defect" as the cause of the fire. 614 So.2d at 441. The insurance company settled with its insured, and it disposed of the van in order to avoid incurring storage fees. Eleven months later, the insurance company and its insured sued the seller and the manufacturer of the van. The defendants' expert testified that he had reviewed the photographs of the van taken by the plaintiffs' investigator. However, the defendants' expert stated that the evidence was very limited and that, because the necessary evidence, i.e., the van, was not available, he could not determine the cause of the fire. The trial court denied the defendants' motion to dismiss the plaintiffs' claims based on the spoliation of the evidence. Our supreme court reversed the trial court's judgment, holding:
 "A reasonable person could have concluded, when [the plaintiffs] dispatched [their] expert . . . to inspect the van and to make photographs, that [the plaintiffs] might sue. According to testimony, however, [the plaintiffs] just did not want to accrue any more charges for having the van stored, so [they] ordered it salvaged. The stark result is that relevant evidence was irreparably lost by the actions of [the plaintiffs]. We conclude that the trial court abused its discretion in not dismissing the case."
Capitol Chevrolet, Inc. v. Smedley, 614 So.2d at 443.
In another case that did not involve a Rule 37 discovery request, this court reversed, in part, a summary judgment in favor of the defendants; the trial court had entered that summary judgment on the basis of the spoliation of evidence. Vesta FireIns. Corp. v. Sears, Roebuck Co., 705 So.2d 382 (Ala.Civ.App. 1996). In Vesta Fire Ins. Corp., an insured's home was destroyed by fire, and the investigator hired by Vesta, the insurer, determined that an air-conditioner unit manufactured and sold by the defendants caused the fire. Vesta retained the air-conditioner unit, took photographs of the fire debris, and then allowed the insured's home to be demolished. The defendants' expert inspected the air-conditioner unit and determined that it had not caused the fire. The trial court entered a summary judgment in favor of the defendants on all of Vesta's claims. This court reversed that part of the trial court's judgment that pertained to Vesta's claims that the air-conditioner unit was defective "and that that defect alone caused the fire." VestaFire Ins. Corp., 705 So.2d at 384. In so holding, this court distinguished the facts of that case from those of CapitolChevrolet, Inc. v. Smedley, supra, by noting that the evidence relevant to the claims that the air-conditioner unit alone caused the fire was still available. Id. Therefore, this court concluded that the facts of Vesta Fire Ins. Corp. were almost identical to those of Cincinnati Ins. Co., supra, in which our supreme court concluded that because the evidence at issue, a regulator, was still available, the plaintiffs should be allowed to proceed on their claims that the regulator was defective.Id.
In its judgment in the case currently before this court, the trial court analyzed the four factors set forth in Cincinnati *Page 605 Ins. Co., supra. The relevant portion of the trial court's judgment reads:
 "According to the [Alabama] Supreme Court opinion in Cincinnati Ins. Co. v. Synergy Gas[, Inc.], [supra], the Court must look at four factors in deciding the appropriate remedy for spoliation of evidence.
 "(1) The importance of the evidence destroyed. Here, the evidence which was destroyed during the repairs is the very essence of this case. An inspection of the damaged areas of the [plaintiffs'] house by the [Gardner] defendants' experts could have determined whether or not the damage was the result of the negligence of the defendants. Without it, they are severely handicapped in their defense of the claim. It is the evidence in this case.
 "(2) The culpability of the offending party. There is no allegation of malicious intent in this case. While there is no evidence before the court addressing this factor, the court notes that plaintiffs' counsel is experienced in this type of litigation. The [action] had been pending for two years before the repairs were undertaken. No notice was given that the work was being done.
 "(3) Fundamental fairness. Here, the scales are heavily weighed in the [Gardner] defendants' favor. It seems fundamentally unfair to require [the Gardner defendants] to defend this claim when the physical evidence is not available to [them] for inspection.
 "(4) Alternative sources of information. The plaintiffs claim that all of the houses built by this builder were built using the same method. The defendant denies that claim. Plaintiffs took over a hundred photographs during the recladding and they have been made available to the [Gardner defendants]. However, [the Gardner defendants'] expert has affirmed that because the evidence has been destroyed, he cannot draw conclusions as to the cause, the origin and the extent of the damages alleged by the plaintiffs. Cincinnati Ins. Co. v. Synergy [Gas, Inc.], supra; Joyner v. B P Pest Control, Inc., [supra].
 "`The spoliation of evidence doctrine mandates dismissal or summary judgment only when the "spoiled" evidence is necessary for the adequate defense of the claim.' Tucker v. General Motors Corp., 769 So.2d 895, 900 (Ala.Civ.App. 1998) [rev'd on other grounds, 769 So.2d 903 (Ala. 1999)]. See also Capitol Chevrolet v. Smedley, [supra].
 "The court has carefully read the Alabama decisions regarding spoliation, along with the decision of the Circuit Court of Madison County, Alabama in Ishler v. Merck, et al., CV-00-139-BEW, April 4, 2002.[4] The court is fully aware of the severity of the remedy and is reluctant to apply it. However, under the undisputed facts of this case, the court concludes that it would be fundamentally unfair to require the [Gardner] defendants to defend this case when they have been deprived of the opportunity of inspecting the damage of which the plaintiffs complain. The evidentiary submissions show that with the evidence destroyed, these defendants would be unable to defend the plaintiffs' allegations, and their inability to defend the case is based solely on the conduct of the plaintiffs. The `spoiled' evidence *Page 606 
was necessary for the defense of the claim. If such evidence had been made available for the [Gardner] defendants' inspection, the court would far more likely have been able to determine the truth in this dispute."
(Emphasis in original.) In its October 10, 2003, order in which it certified its summary judgment in favor of the Gardner defendants as final pursuant to Rule 54(b), the trial court made the following additional findings:
 "Having considered the supplemental filings, the court's opinion is unchanged from the entry of the summary judgment on January [3], 2003. It would be fundamentally unfair to require these defendants to defend this case when they have been deprived of the opportunity to inspect the damages of which the plaintiffs complain.
 "It should be made clear that the court does not believe that there has been any bad faith destruction of evidence by anyone. In this case, it is not the intent but the result which ha[s] led the court to its conclusion."
In their brief on appeal, the plaintiffs address the factors set forth in Cincinnati Ins. Co.[5] We have elected to address those factors in the order in which they were analyzed by the trial court in its judgment.
 Importance of the Evidence Destroyed
The plaintiffs do not make a specific argument pertaining to this factor; rather, they focus on their assertion that alternative sources of evidence were available from which the Gardner defendants could obtain information. That issue is discussed later in this opinion. With regard to the factor of the importance of the evidence destroyed, the trial court found that the plaintiffs' claims were based on the EIFS materials that were ultimately disposed of or destroyed and that the EIFS materials were "the evidence" in the case. Our review of the record indicates that the trial court did not err in making that finding. Given the evidence in the record on appeal, we cannot say that the trial court's conclusion that the evidence that was destroyed was necessary for the Gardner defendants' defense of the plaintiffs' claims was error.
 Culpability of the Offending Party
The plaintiffs argue that the trial court's finding that they did not act in bad faith in disposing of the EIFS material precludes the entry of a summary judgment on the issue of spoliation of the evidence. In this case, as in Cincinnati Ins.Co., supra, the trial court noted that there was no allegation of malicious intent on the part of the plaintiffs in the destruction or disposal of the EIFS material. Our courts have held "`willfulness,' i.e., an intentional failure, continues to be a factor, along with others, in the determination to apply the sanction of dismissal." Blair v. Cooper, 437 So.2d 1249,1252 (Ala. 1983) (emphasis added); see also Ex parte SeamanTimber Co., 850 So.2d 246 (Ala. 2002); Cincinnati Ins. Co., supra; Iverson, supra. In making their argument on this issue, the plaintiffs equate "bad faith" with willfulness. We conclude, however, that the trial court's finding that the plaintiffs did not act in "bad faith" in allowing the EIFS material to be disposed of or destroyed does not preclude a finding of willfulness, or intentional failure, on the part of the plaintiffs. *Page 607 
In this case, the plaintiffs had the reclad work performed over a year and a half after they had filed their complaint. During the several months the reclad work was being performed, the plaintiffs' expert inspected the home 11 times. The plaintiffs indicated they would call that expert, as well as one of the people who performed the reclad work, as witnesses in the trial. The plaintiffs contend that the Gardner defendants should be held responsible for the damage to their home that was allegedly uncovered during the reclad process. However, during the four months it took for the completion of the reclad work, neither the plaintiffs nor their attorneys provided any notice[6] to the Gardner defendants that they were having the additional work on the home performed. Therefore, the Gardner defendants had no opportunity to inspect the plaintiffs' home, as did the plaintiffs' witnesses, during the reclad process.
In reaching its judgment and determining that the plaintiffs should have notified the Gardner defendants of the reclad work, the trial court noted that the plaintiffs' attorneys are experienced in this type of litigation. In cases in which parties destroyed relevant evidence before filing their complaints, our supreme court has considered, as evidence of the factor of culpability, the fact that the parties knew or should have known that litigation would ensue and that the evidence would be relevant to that litigation. Capitol Chevrolet, Inc. v.Smedley, supra; Cincinnati Ins. Co., supra. The plaintiffs contend in their brief on appeal that the Gardner defendants' attorneys were equally experienced in this type of litigation and that they should have filed a request for the preservation of any relevant evidence. However, the record would support a conclusion that it was reasonable for the Gardner defendants to conclude that the more than $20,000 in repairs performed in 1999 formed the basis of the plaintiffs' claims. The plaintiffs point to nothing in the record that would tend to support a conclusion that the Gardner defendants should have been deemed to have notice that repair work in addition to that already performed by the time the plaintiffs filed their June 1, 1999, complaint would be necessary.
 Fundamental Fairness
The plaintiffs contend that the Gardner defendants failed to take advantage of their opportunities to inspect the property. The plaintiffs contend that the Gardner defendants could have inspected their home when it was being constructed in 1992. They also contend that during his November 17, 1999, inspection, Smith could have performed a more thorough inspection of their home. In their brief on appeal, the plaintiffs contend that they "cannot be responsible for forcing the Gardner defendants to do a reasonable and timely inspection."
However, as discussed earlier, the evidence in the record supports a conclusion that Smith's November 17, 1999, inspection was reasonable given the nature of the plaintiffs' claims at that time. Smith testified that on November 17, 1999, the Gardner defendants' attorney instructed him *Page 608 
not to perform moisture testing on the plaintiffs' home. Smith later explained that such testing was appropriate for a determination of the existence of damage. At the time of Smith's November 17, 1999, inspection, however, the plaintiffs had had extensive repairs performed on the EIFS on their home. There is nothing in the record that would indicate that, at the time of Smith's inspection, the plaintiffs had not completed the expected repairs to their home or that further repairs would be necessary. Therefore, we cannot say that the trial court was required to conclude that the Gardner defendants, or their expert, should have conducted more extensive testing during their inspection of the plaintiffs' home.
 Alternative Sources of Information
The plaintiffs also argue that there were alternate sources of information available to the Gardner defendants. The plaintiffs point out that the record contains hundreds of photographs that depict their home during the various stages of the reclad work. The plaintiffs also contend that the Gardner defendants have the report from the plaintiffs' expert witness available to them.
The report of the plaintiffs' expert witness, on which the plaintiffs assert the Gardner defendants could rely in formulating their defense, contains only the witness's conclusions and opinions based on his visual inspection of the plaintiffs' home. Even assuming that any tests performed by that witness could be said to be objective, the report does not contain any results from any such tests.
The record on appeal contains numerous photographs of the plaintiffs' home during various stages of the reclad work. However, Smith testified that it was necessary for him to inspect the evidence that had been disposed of in order to be able to render an opinion on the cause of the damage to the plaintiffs' home, and the extent, if any, of the damage caused by the Gardner defendants. Smith's deposition testimony indicated that he was unable to form opinions regarding some facts based solely on the photographs of the plaintiffs' home during the reclad work. In his affidavit executed shortly after his deposition, Smith testified that he could not determine the "extent, source and cause of damage to the [plaintiffs'] home" from the photographs.
The plaintiffs cite Joyner v. B P Pest Control, Inc., supra, and maintain that, like the defendant in that case, the Gardner defendants had photographs on which to rely and that they could cross-examine the people who performed the reclad work. In this case, however, the undisputed evidence is that those forms of evidence were not sufficient to enable Smith, the Gardner defendants' expert witness, to form an opinion on the issues in dispute. The plaintiffs have not presented any evidence that an expert witness could or should be able to form an opinion based on the photographs of the home taken by their witnesses. In fact, the plaintiffs themselves indicated that their own expert witnesses would testify that the true extent of damage to the plaintiffs' home could be determined only upon the removal of the EIFS from the home.
The facts of Joyner v. B P Pest Control, Inc., supra, are also distinguishable from the facts of this case in that the flooding in Joyner occurred shortly after the defendant worked on the house, indicating a lack of intervening factors between the time of the defendant's alleged negligence and the time the flooding occurred. In this case, it is not clear when the damage occurred in relation to the Gardner defendants' work on the plaintiffs' home. In addition, a company not involved in this litigation had performed extensive *Page 609 
repairs on the EIFS on the plaintiffs' home approximately two years before the reclad work was done.
The evidence in the record on appeal indicates that the alternate sources of information available in this case were not sufficient for the Gardner defendants' expert to reach conclusions regarding the causation and extent of the damage to the plaintiffs' home. Therefore, we cannot say that the trial court erred in determining that there were no adequate alternative sources of information available to the Gardner defendants.
 Alternative Sanctions
The plaintiffs also briefly argue in their brief on appeal that the sanction of dismissal was not warranted in this case and that the case should have proceeded to trial with the trial court giving a limiting jury instruction as a more appropriate sanction. In support of this argument, the plaintiffs cite several cases for the proposition that evidence that a party has disposed of or destroyed evidence will support an inference of that party's culpability. See Wal-Mart Stores, Inc. v. Goodman,789 So.2d 166, 176 (Ala. 2000); May v. Moore, 424 So.2d 596,603 (Ala. 1982) (holding that the jury could consider the fact that the defendant doctor might have destroyed a medical chart as an indicator of the doctor's negligence). In this case, however, such an instruction would allow a jury to conclude only that the plaintiffs allowed the destruction or disposal of the EIFS materials. Assuming that a jury concluded that the plaintiffs had intentionally destroyed or disposed of the EIFS materials, that determination would not be relevant to assisting a jury in its consideration of the ultimate issue of whether the Gardner defendants' actions caused damage to the plaintiffs' home or to what extent of any damage resulted from the Gardner defendants' actions.
The plaintiffs also contend in their brief on appeal that, even assuming the trial court's judgment is proper as to their claims based on the damage to their home allegedly caused by the improper installation of the EIFS, the trial court erred in dismissing their entire case. The plaintiffs contend that at the very least they should be allowed to "go forward and prove the reasonableness for the necessity for the reclad without the evidence of the underlying damages found during the reclad."
In Copenhagen Reinsurance Co. v. Champion Home Builders Co.,872 So.2d 848 (Ala.Civ.App. 2003), this court reversed, in part, a summary judgment entered in favor of the defendants on the basis of the spoliation of the evidence. In that case, a mobile home was destroyed in a fire, and the plaintiffs' expert witness identified a number of possible causes of the fire, all of which were related to the wiring in the mobile home. However, the plaintiffs preserved only a portion of the evidence and allowed the rest to be destroyed. This court held, in part, that not all of the appellant plaintiff's claims were properly dismissed, concluding that the appellant plaintiff's claim made pursuant to the Alabama Extended Manufacturer's Liability Doctrine "should have been allowed to proceed to trial solely on the theory that the wiring and the receptacle-branch unit kept by [the plaintiffs' expert] were defective and that they caused the fire." Copenhagen Reinsurance Co., 872 So.2d at 854.
In this case, however, the Gardner defendants did not have an opportunity to inspect the EIFS materials to determine whether the reclad work was necessary; Smith expressed uncertainty as to the need for the reclad work. There is no remaining evidence available, as there was in Copenhagen Reinsurance Co., supra, that would allow the Gardner defendants *Page 610 
to dispute the necessity of the reclad work. Therefore, for the reasons already discussed in this opinion, we cannot say that the trial court erred in entering a summary judgment on the plaintiffs' claims against the Gardner defendants.
 Conclusion
We conclude that the facts of this case are most similar to those of Capitol Chevrolet, Inc. v. Smedley, supra. In both cases, the evidence that formed the basis of the plaintiffs' claims was lost or destroyed, and photographs were available that purportedly evidenced the alleged damage. However, in both cases, the defendants' expert witness testified that the lost or destroyed evidence was necessary to determine the issue of causation. In Capitol Chevrolet, Inc. v. Smedley, our supreme court concluded that a reasonable person should have concluded that litigation would ensue and that the evidence should have been preserved. In this case, litigation was actually pending pertaining to the very evidence that was destroyed.
In reaching our holding in this case, we must note that the plaintiffs have not argued that the trial court erred in dismissing that part of their claims that pertained only to the original repairs to the EIFS performed in 1999. Any argument not raised on appeal is deemed to be waived. Robino v. Kilgore,838 So.2d 366, 370 (Ala. 2002). See also Pardue v. Potter,632 So.2d 470, 473 (Ala. 1994) ("Issues not argued in the appellant's brief are waived.").
We recognize that the plaintiffs had a duty to mitigate their damages. See Avco Fin. Servs., Inc. v. Ramsey, 631 So.2d 940,942-43 (Ala. 1994) (discussing the duty to mitigate damages). We also recognize that disposing of a case based on the spoliation of the evidence is a drastic sanction. However, as the trial court noted in its judgment, the resolution of this dispute based on the evidence would have been possible had the plaintiffs simply notified the Gardner defendants of the reclad work and provided them the same opportunity as the plaintiffs to inspect the home during the reclad process. Such notice, assuming the defendants took advantage of the opportunity to inspect the plaintiffs' home after the removal of the EIFS materials, would not have substantially affected the reclad repairs that the plaintiffs contend were necessary to mitigate their damages in this case. Given the facts of this case and the arguments made by the parties, we must agree with the trial court that the entry of a summary judgment in favor of the Gardner defendants was appropriate. See Capitol Chevrolet, Inc. v. Smedley, supra.
AFFIRMED.
CRAWLEY and PITTMAN, JJ., concur.
YATES, P.J., and MURDOCK, J., concur in the result, without writing.
[1] A postjudgment motion filed pursuant to Rule 59, Ala. R. Civ. P., can be filed only in reference to a final judgment.Momar, Inc. v. Schneider, 823 So.2d 701 (Ala.Civ.App. 2001);Malone v. Gainey, 726 So.2d 725, 725 n. 2 (Ala.Civ.App. 1999). Our supreme court has recently discussed this principle by stating:
 "By its express terms, Rule 59(e) applies only where there is a `judgment.' That term is specifically defined in Ala. R. Civ. P. 54(a), as `a decree and any order from which an appeal lies.' (Emphasis added.) Rule 59 does not apply to interlocutory
orders, because such orders remain `within the breast of the court.' Rheams v. Rheams, 378 So.2d 1125, 1128 (Ala.Civ.App. 1979). A `Rule 59 motion may be made only in reference to a final judgment or order.' Malone v. Gainey, 726 So.2d 725, 725 n. 2 (Ala.Civ.App. 1999); see also Anderson v. Deere Co., 852 F.2d 1244, 1246 (10th Cir. 1988); Momar, Inc. v. Schneider, 823 So.2d 701, 704 (Ala.Civ.App. 2001) (a Rule 59(e) `motion may be taken only from a final judgment'). Therefore, the tolling effect of Rule 59 is not involved with respect to motions to `reconsider' interlocutory orders. See Wagoner v. Wagoner, 938 F.2d 1120, 1122 n. 1 (10th Cir. 1991) (a `motion for reconsideration' of an interlocutory order does not `call into play the timing and tolling considerations attendant upon motions to alter or amend judgment[s] under Fed.R.Civ.P. 59(e)')."
Ex parte Troutman Sanders, LLP, 866 So.2d 547, 549-50 (Ala. 2003).
[2] The record contains a letter from Construction Mechanical Engineers, a building contractor, that explains the use of EIFS on a home as follows:
 "EIFS is a synthetic stucco exterior assembly that uses foam plastic adhesively applied or mechanically fastened to exterior wall sheathing. . . . EIFS is designed to resist the effects of weather. . . . "EIFS is different from traditional portland cement plaster stucco in that it is made from both synthetic and natural materials. EIFS walls [are] different . . . from conventional stucco by their construction detail. . . . The base coat is the rain barrier, while the finish coat provides color and texture.
". . . .
 "EIFS is designed to be a face-sealed barrier providing a weatherproof membrane. All water must be shed at the outermost surface of the EIFS lamina, since water entering behind the base coat can enter the wall cavity. Therefore, water-tight sealing around penetrations such as windows, doors, electrical outlets, vents, roofing, etc., is essential to maintaining the integrity of EIFS."
[3] The "customer information form" and the document listing the invoices submitted by the Gardner defendants in support of their motions for a summary judgment do not indicate the name of the business from which those forms were generated. The plaintiffs did not contest that they, or their attorney, sought the estimate from Precision HomeCrafters in mid-January 2001, or that the document listing the invoices was generated by Precision HomeCrafters.
[4] The trial court in that case certified as final pursuant to Rule 54(b), Ala. R. Civ. P., the April 4, 2002, order referenced by the trial court in this case. No appeal was taken from that April 4, 2002, final judgment. However, the case is currently in this court on appeal from a final judgment involving other parties. That appeal, which is currently in the briefing stages, is denominated as Ishler v. Cook's Pest Control, Inc., case number 2030043.
[5] In addition to their discussion of the factors set forth inCincinnati Ins. Co., supra, the plaintiffs cite numerous cases from other jurisdictions. We conclude that there is ample Alabama precedent on this issue, and we decline to adopt the analysis or reasoning applied by courts from other jurisdictions to the facts of this case.
[6] The plaintiffs contended in their August 21, 2001, opposition to the Gardner defendants' motion for a summary judgment that the Gardner defendants were "on notice through answers to interrogatory questions and the reclad estimates supplied in the request for production that [the plaintiffs] intended to reclad their home in the near term." However, the plaintiffs did not file those discovery items in support of the August 21, 2001, opposition to the summary-judgment motion, and they were not included in the record in support of the plaintiffs' later filings during the time this issue was pending before the trial court.